## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| THEOPHILUS EKOH OJUKWU, | ) | |
| ID # 1420209, | ) | |
| Petitioner, | ) | |
| vs. | ) | No. 3:15-CV-2815-G-BH |
| | ) | |
| LORIE DAVIS,[1] Director, | ) | Referred to U.S. Magistrate Judge |
| Texas Department of Criminal | ) | |
| Justice, Correctional Institutions Division, | ) | |
| Respondent. | ) | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3-251*, this habeas case has been referred for findings, conclusions, and recommendation. Based on the relevant findings and applicable law, the petition for writ of habeas corpus under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

### I. BACKGROUND

Theophilus Ekoh Ojukwu (Petitioner) challenges his conviction for murder. The respondent is Lorie Davis, Director of the Texas Department of Criminal Justice (TDCJ), Correctional Institutions Division (Respondent).

On May 8, 2006, the State indicted Petitioner for murder in Cause No. F10-28340. (Doc. 29-4 at 6, 8.)[2] On September 25, 2006, he pleaded not guilty and proceeded to trial before a jury in the 363rd Judicial District Court of Dallas County, Texas. (Doc. 24-3 at 42, p. 157.) After two witnesses testified, Petitioner decided to change his plea to guilty and to proceed before the jury for sentencing. (Doc. 24-5 at 9, pp. 9-10.)

---

[1] Lorie Davis succeeded William Stephens as Director of the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ). Under Rule 25(d) of the Federal Rules of Civil Procedure, she "is automatically substituted as a party."

[2] Page citations refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

A.    **Punragraph Phase**[1]

Petitioner's ten-year-old son testified that his mother and sister slept in the master bedroom, he and his two brothers slept in a second bedroom, and Petitioner slept in a third bedroom. His mother worked nights as a nurse at a hospital. On March 25, 2006, she returned home from work at 8:00 a.m., with breakfast for the children. While the children watched television and ate their breakfast, she went into the master bedroom to take a shower and go to sleep. Petitioner was asleep at the time but woke up after his mother had gone to sleep. Petitioner came out of his room, said that he was going to the garage to smoke, and went into the garage. He stayed in the garage about two minutes, then came back inside and went into the master bedroom.

When he went to the garage and came back inside the house, he behaved normally and did not seem upset. After Petitioner went in the master bedroom, the son heard "screaming and crying." He did not hear any yelling or talking before the screams, and he thought Petitioner was whipping his mother with a belt. After five minutes, Petitioner came out of the master bedroom with blood on his clothing. He calmly walked back to the garage, stayed a few minutes, then returned to the house and changed his clothing. Petitioner then drove with the children to a bank, a convenience store, and eventually a motel. He told them that he gave their mother a "whooping because she was doing stuff wrong. She was bringing other men into our house," and that she was "not living anymore." The son testified there were no other men around the house except for a next-door neighbor who came over "once in a while" and played with the children. At the motel, Petitioner fed them pizza and then called 911.

A Mesquite police detective testified that he received a 911 call from Petitioner at 4:47 p.m.

---

[1] The summary of the evidence at trial is taken from the state appellate court's opinion. *See Ojukwu v. State*, 05-07-01436-CR, 2008 WL 3307111 at *1-3 (Tex. App. – Dallas July 31, 2008).

on March 25, 2006. The call originated from the motel. Petitioner said he had killed his wife. An audiotape of the 911 call was played to the jury.

A Garland 911 operator testified that Petitioner's 911 call was transferred to her from the Mesquite police department. During the call, Petitioner said that he had killed his wife by striking her in the head with an unknown object. He gave a street address in Garland and said that his wife was in the house.

When officers arrived at Petitioner's house, they found his wife lying in a pool of blood in the master bedroom. Officer Stephanie McCall, who photographed the crime scene, testified that the wife's body was on a mattress on the floor at the foot of a bed. She had multiple cuts on her forehead and the top and back of her head. A socket wrench with blood and hair on it was laying next to her. There was blood splatter on all of the bedroom walls, the exterior of the bathroom door, and the bathroom floor. McCall found a tool set on a bookshelf in the garage with an empty space for a wrench.

Dr. Reade Quinton performed an autopsy. He testified that Petitioner's wife died from multiple blunt-force injuries to the head. There were at least eight lacerations on her head, and defensive-type wounds, including lacerations and broken bones, on both hands.

Petitioner testified that he killed his wife by hitting her in the head with "an instrument" because he was under the influence of sudden passion. They sometimes argued about money and the fact that other men were coming to the house. He saw other men in his house on more than three occasions, and she did not deny having affairs with the men. On March 25, 2006, he was asleep in the master bedroom when she returned home from work. He woke up when he heard the shower running. He denied that he was sleeping in the second bedroom, or that he went into the garage to

smoke.  He went into the bathroom and saw his wife with an unknown man with his pants were

pulled down.  Petitioner had never seen the man before and did not know his name.  The man pushed

past him and ran out of the house.  Petitioner grabbed a dumbbell that was in a bucket under the sink

and hit his wife on the head twice.  He thought she was probably already dead at that point, but he

carried her body into the bedroom and placed her on a mattress.  He grabbed a wrench that was

laying next to the bed and hit her on the head several more times.  Petitioner left the wrench laying

next to the body, changed his clothing, and drove his children to a motel to get them out of the

house.  He called the police from the motel because he knew he had broken the law.  During cross-

examination, he admitted that he had been smoking about $150 of crack cocaine a day for two years

prior to the murder, but denied he had smoked crack that day.

       In rebuttal, the State called Detective Stacy Tooke.  He testified that officers had responded

to Petitioner's house regarding complaints of a husband threatening to hurt a wife in October 2005

and February 2006, but she failed to follow up on either case.  Tooke learned that she had been

murdered on March 25, 2006.  Officers recovered a wrench that was laying next to her body, but

they did not find a dumbbell anywhere in the house or garage.  When Tooke entered the house, he

saw blood on a mattress in the master bedroom and blood splattered on every wall.  The bathroom

had a small amount of blood splatter on the floor and door.  When Tooke talked with Petitioner at

the jail, Petitioner talked about his cocaine habit and the fact he had not worked since November

2005.  He said that he hit his wife because she was "doing porno there in the room."  Tooke did not

find a camera setup or computer with a camera or pornography in the bedroom.  Petitioner said she

had been sleeping with other men, but he did not give any details or names of the men.  He also said

that he last smoked crack cocaine the day before the murder.  Petitioner never stated that he had

found another man in the room with his wife shortly before he killed her.  A videotape of Tooke's interview with Petitioner was played for the jury.

A cousin of the wife testified that she complained to him that Petitioner would threaten her over money.  Petitioner would go to her workplace, pick up her check, and spend the money.  When she began putting her money into a separate bank account, Petitioner used intimidation to gain access to it.

The jury found that Petitioner did not act under the immediate influence of sudden passion arising from adequate cause, and he received a sentence of life imprisonment.  (Doc. 24-9 at 50, 55.)

## B.  <u>Post-conviction Proceedings</u>

Petitioner's initial appeal was dismissed as untimely.  *Ojukwu v. State*, No. 05-06-01587-CR, 2006 WL 3691741 (Tex. App. – Dallas Dec. 15, 2006).  He filed a state habeas application on April 26, 2007.  (Doc. 24-19 at 6); *see Ex parte Ojukwu*, WR-68,049-01 (Tex. Crim. App.).  The Texas Court of Criminal Appeals granted relief in the form of an out-of-time appeal.  (Doc. 24-25 at 2); *see Ex parte Ojukwu*, AP-75,734 (Aug. 22, 2007).  The judgment was affirmed on the second appeal.  *Ojukwu v. State*, 05-07-01436-CR, 2008 WL 3307111 at *1-3 (Tex. App. – Dallas July 31, 2008).  His petition for discretionary review was refused.  *Ojukwu v. State*, PD-1231-08 (Tex. Crim. App. Dec. 17, 2008).  He filed a second state habeas application on November 12, 2009.  (Doc. 24-23 at 5.)  On August 5, 2015, the Texas Court of Criminal Appeals denied the application without written order on the findings of the trial court.  (Doc. 24-21); *see Ex parte Gillam*, No. WR-68, 049-02 (Tex. Crim. App. Aug. 5, 2015).

C.    **Substantive Claims**

Petitioner's habeas petition, signed on August 20, 2015, raises the following grounds:

(1) Trial counsel was ineffective because he:

    (a) failed to properly and thoroughly investigate his wife's bank records;

    (b) failed to obtain exculpatory evidence in the form of bank statements and police reports from prior altercations at their home;

    (c) failed to obtain a police report from a 2004 domestic disturbance incident;

    (d) failed to properly cross-examine the wife's cousin about money, threats, and an allegation that Petitioner routinely went to his wife's place of employment to get her paychecks so that he could spend the money on drugs;

    (e) failed to impeach his ten-year-old son with prior inconsistent statements regarding whether he had seen strange men in the home;

    (f) failed to subpoena his wife's bank records to show that her paychecks were directly deposited;

    (g) failed to interview Petitioner's half-brother before he testified;

    (h) failed to object to leading questions that led a witness to testify that he went to the garage to obtain the murder weapon;

    (i) failed to obtain an expert witness to explain how his state of mind and actions were affected by the cultural differences between Petitioner's native country and the United States;

(2) The prosecutor failed to provide *Brady* material;

(3) The trial court erred by excluding the son's prior statement and his wife's bank records;

(4)  The 1993 amendment to Texas Penal Code § 19.02 that changed the issue of sudden passion from an element of voluntary manslaughter to a sentencing factor for murder was unconstitutional.

(Doc. 3 at 7-11.) Respondent filed a response on February 9, 2016.  (Doc. 25.)  Petitioner filed a reply on February 29, 2016.  (Doc. 26.)

## II.  APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Because Petitioner filed his petition after its effective date, the Act applies.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions.  Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural."  *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established federal law within the meaning of § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  As for the "unreasonable application" standard, a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

In his first ground, Petitioner contends that his trial counsel rendered ineffective assistance in numerous respects.

The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. art. VI. The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal. *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To successfully state a claim of ineffective

assistance of counsel, the prisoner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his or her defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective. *See* 466 U.S. at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

In determining whether counsel's performance is deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691. To establish prejudice, a Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (inquiry focuses on whether counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent counsel's alleged errors. *Strickland*, 466 U.S. at 695-96.

To show prejudice in the sentencing context, the Petitioner must demonstrate that the alleged deficiency of counsel created a reasonable probability that his or her sentence would have been less harsh. *See Glover v. United States*, 531 U.S. 198, 200 (2001) (holding "that if an increased prison term did flow from an error [of counsel] the petitioner has established *Strickland* prejudice"). One cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v.*

*Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations are insufficient to obtain relief under § 2255. *United States v. Woods*, 870 F.2d 285, 288 n.3 (5th Cir. 1989); *United States v. Daniels*, 12 F. Supp. 2d 568, 575-76 (N.D. Tex. 1998); *see also Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (holding that "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding").

## A.    <u>Bank Records</u>

Petitioner contends that counsel failed to investigate, obtain, and subpoena his wife's bank records to refute the States's theory that he went to her place of employment to get her paychecks and used the money for drugs. He asserts that the bank records would show that he made a $20,000 deposit. He also claims that counsel failed to properly cross-examine his wife's cousin regarding his testimony that Petitioner routinely picked up her paychecks and spent the money on drugs.

Petitioner raised these claims in his second state habeas application. The state habeas court entered findings in support of its rejection of the claims. Counsel subpoenaed the bank records, and the prosecutor provided counsel with a copy of the bank records. Although the bank records show that Petitioner's wife's paychecks were deposited directly into their joint account, they support the State's theory that Petitioner was spending money on drugs. He regularly withdrew money, and the account was often overdrawn. The bank records show that shortly before her murder, Petitioner's wife moved money from a $20,000 home equity loan to a new bank account that she had recently opened. The court found that counsel apparently made a strategic decision not to use the bank records because they would not have aided the defense. Petitioner failed to rebut the presumption that counsel's decision not to offer the bank records into evidence or use them to cross-examine the cousin was sound strategy. The records would have bolstered the State's case, and Petitioner was

10

not prejudiced by the failure to use them.  (Doc. 24-23 at 65 ¶¶ 24-29, 85, 111-12, 119.)

 If counsel has made an adequate investigation, an informed decision based on trial strategy cannot be the basis for a claim of ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753 (5th Cir.2003), quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir.2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir.2002).  Petitioner has not made this showing or overcome the presumption of sound trial strategy in deciding not to use the bank records.  Petitioner has not shown that the state court's rejection of these claims was unreasonable.

**B.** <u>**Police Reports**</u>

 Petitioner contends that counsel failed to obtain police reports from prior altercations at their home, including a report from a 2004 domestic disturbance incident that reflected his children's statements to the police that a man had been at the house each weekend while Petitioner was out of the country for a month.  He asserts that counsel should have used the 2004 report to impeach his son's testimony that there were no other men at the house.

 The state habeas court made findings on these claims.  Petitioner presented a purported 2009 affidavit from the son that referred to the 2004 incident and police report in which he told the police about the man coming to the house while Petitioner was away.  The son executed an affidavit in 2015 in which he stated that he did not remember the 2009 affidavit, the statements in the 2009 affidavit about men coming to the house were not true, and his trial testimony was true.  The court found the 2009 affidavit was not credible and the 2015 affidavit and trial testimony credible.  The State was aware of only two prior incidents involving Petitioner and his wife.  One incident was in October 2005 and the other was in February 2006, just a few weeks before the murder.  The State

provided counsel with the police reports from those incidents.  Neither report indicates that the son told the police that other men had been at their home.  The 2005 incident was reported to be about money.  In the 2006 incident, Petitioner reportedly came home and threatened to hurt his wife. Petitioner failed to show that there was a 2004 incident or a related police report.  Counsel was not ineffective for failing to obtain a non-existent police report or statement.  (Doc. 24-23 at 66-67 ¶¶ 30-40, 78, 97-102, 109, 111-12.)

Petitioner has not shown that the state court's rejection of this claim was unreasonable.

**C.    Half-brother**

Petitioner contends that counsel failed to interview his half-brother before calling him as a witness, which led to his damaging testimony.

The state habeas court entered findings on this claim.  Counsel could not recall whether he interviewed the half-brother.  Petitioner presented no evidence that counsel did not interview him. The half-brother's testimony suggests that counsel had some interaction with him before his testimony, and that counsel anticipated that he would provide favorable testimony.  He testified about his relationship with Petitioner, his custody of Petitioner's children, and his opinion that Petitioner was a good father and husband who changed when he started using drugs.  His testimony was beneficial to the defense.

On cross-examination, he testified that he regretted not talking to Petitioner about his drug use, that he encouraged Petitioner to leave his wife, and that he realized after the murder that Petitioner was dishonest about his relationship with his wife.  The testimony on cross-examination was not highly prejudicial and did not provide the jury with any new information.  Although some of his testimony was unfavorable to Petitioner, counsel's strategic decision to call him as a witness

was sound and reasonable.  Petitioner did not show deficient performance regarding counsel's pretrial interaction with his half-brother, and he did not show prejudice.

Petitioner has not shown that the state court's rejection of this claim was unreasonable.

**D.    Leading Questions**

Petitioner contends that counsel failed to object to leading questions that led his son to testify that Petitioner went to the garage to obtain the murder weapon, which indicated that he acted with premeditation rather than sudden passion.  He does not identify any leading questions.

The state habeas court entered findings on this claim.  The son was not asked leading questions, so counsel was not deficient for failing to object.  Counsel established on cross-examination that the son did not see Petitioner holding a wrench when he went from the garage to the bedroom.  Counsel was able to impeach the son to the extent that he could.

Counsel was not ineffective for failing to make a meritless objection.  *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999); *see also Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("counsel is not required to make futile motions or objections").  Petitioner has not shown that the state court's rejection of this claim was unreasonable.

**E.    Expert Witness**

Petitioner contends that counsel failed to obtain an expert witness to explain how his state of mind and actions were affected by the cultural differences between Petitioner's native country and the United States.

The state habeas court entered findings on this claim.  Petitioner did not show that there was such an expert witness, what the expert's testimony would have been, or that an expert would have been beneficial to the defense.  To the extent that Petitioner asserts that an expert would have

testified about how a Nigerian's view of infidelity by his wife might explain a husband's anger and violent response to infidelity, there was no credible evidence that he murdered his wife because of any infidelity.  His account that he found her with another man was refuted by his son and the physical evidence.  Her murder was precipitated by his drug use and the fact that she was trying to limit his access to money to fund his drug use.  Counsel was not ineffective for failing to obtain an expert witness on cultural differences.  (Doc. 24-23 at 69-70 ¶¶ 57-63.)

## IV.  *BRADY* CLAIM

Petitioner contends that the prosecutor failed to provide the 2004 police report, which was *Brady* material.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that a prosecutor must disclose evidence to a criminal defendant if that evidence is favorable to the defendant and material to his guilt or punishment.  "Brady claims involve 'the discovery, after trial of information which had been known to the prosecution but unknown to the defense.'"  *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994).  "There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Evidence is material within the meaning of *Brady* only when there is a reasonable probability of a different result at trial had the evidence been disclosed.  *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).

The state habeas court entered findings on this claim.  Petitioner failed to show that there was a 2004 police report that the State possessed and failed to disclose.  The State disclosed the only two police reports of which the prosecutor was aware.  Even if there were such a report, it would not

14

have been material because it would have provided little, if any, support for Petitioner's claim that he acted out of sudden passion two years later.  (Doc. 24-23 ¶¶ 64-72.)

Petitioner has not shown that the state court's rejection of this claim was unreasonable.

## V.  EXCLUSION OF EVIDENCE

Petitioner contends that the trial court erred in excluding his son's prior statement in the 2004 police report and his wife's bank records.

The state habeas court again found that Petitioner did not show that there was any 2004 police report involving Petitioner and his wife that included any statement from his son.  No such report was offered into evidence, and the trial court did not exclude any such report or prior statement.  (Doc. 24-23 at 72 ¶¶ 82-85.)

The wife's bank records were not offered into evidence, and the trial court did not exclude bank records.  Although the state habeas court did not make specific findings on this claim, the court found that all other grounds lacked merit (doc. 24-23 at 74 ¶ 100), and the Texas Court of Criminal Appeals denied the state habeas application.

Petitioner has not shown that the state court's rejection of these claims was unreasonable.

## VI.  TEXAS PENAL CODE § 19.02

Petitioner contends that the 1993 amendment to Texas Penal Code § 19.02 that changed sudden passion from an element of voluntary manslaughter to a sentencing factor for murder is unconstitutional because he had the burden of proof on the issue but was not allowed to argue last to the jury.

The state habeas court entered findings on this claim.  This was an issue that Petitioner should have raised on direct appeal, so the claim was procedurally barred.  It also lacked merit.  He

did not show that there is a constitutional right to argue last if the party has the burden of proof. Although Petitioner had the burden of proving sudden passion under section 19.02(d), the State had the burden of overcoming evidence of sudden passion and was properly permitted to argue last. *See Gafford v. State*, 262 S.W.3d 452, 454 (Tex. App. – Texarkana 2008, pet. ref'd). (Doc. 24-23 at 72-74 ¶¶ 85-99.)

When a claim was dismissed by a state court pursuant to an independent and adequate state procedural rule, federal habeas review of that claim is barred unless the petitioner can establish either cause for the default as well as actual prejudice as a result of the alleged violation of federal law or that the failure to consider the claims would result in a fundamental miscarriage of justice, which requires the petitioner to establish that he is actually innocent of the offense. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Roberts v. Thaler*, 681 F.3d 597, 605 (5th Cir. 2012). A claim is procedurally defaulted if the state habeas court explicitly found that the claim could have been, but was not, raised on direct appeal, unless one of the exceptions set forth in *Coleman* has been met. *Brewer v. Quarterman*, 466 F.3d 344, 347 (5th Cir. 2006). Such a claim is procedurally barred even if the state habeas court reached the merits in the alternative. *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000).

Here, the state habeas court concluded that this ground was procedurally barred because it was not, but should have been, raised on direct appeal. Because this ground was denied at the state level on the basis of an independent and adequate state ground, the claim is barred from federal habeas review unless Petitioner can show either cause and prejudice or that the failure to consider the claim on the merits would result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. He does not argue, and the record does not show, that he is actually innocent of the offense

16

or that there was cause to excuse the procedural bar. This claim is procedurally barred from federal review. The claim also lacks merit.

Petitioner does not argue how section 19.02 is unconstitutional. As in the state court, he does not argue that he had a constitutional right to present the concluding or last argument to the jury. He asks that Texas Penal Code § 19.02(d) (burden of proof on defendant to prove sudden passion) be construed to abrogate Texas Code of Criminal Procedure art. 36.07 (the State shall have the right to make the concluding address to the jury). In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The correctness of the state court's interpretation of state law is beyond the scope of federal habeas review. *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004); *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995). The correctness of the state court's interpretation of section 19.02(d) and article 36.07 is not reviewable.

Petitioner has not shown that the state court's rejection of this claim on procedural grounds and alternatively on the merits was unreasonable.

## VII. EVIDENTIARY HEARING

Upon review of the pleadings and the proceedings held in state court as reflected in the state court records, an evidentiary hearing appears unnecessary. Petitioner has not shown he is entitled to an evidentiary hearing.

## VIII. RECOMMENDATION

The petition for habeas corpus relief under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

17

**SO RECOMMENDED** this 18th day of July, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

18